

IN THE

# Court of Appeals of Indiana

Steven Norris,

*Appellant-Petitioner,*

v.

Jennifer Norris,

*Appellee-Respondent.*



FILED

Feb 10 2025, 8:54 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

February 10, 2025

Court of Appeals Case No.
24A-DR-1109

Appeal from the
Marion Superior Court

The Honorable
Alicia A. Gooden, Judge

Trial Court Cause No.
49D14-1403-DR-9766

**Robb, Senior Judge.**

## Statement of the Case

Steven Norris appeals from the trial court's order resolving numerous motions for rule to show cause filed by him and by his ex-wife Jennifer Norris in post-dissolution proceedings.

After reviewing the trial court's order: (1) we affirm the trial court's finding that Jennifer is in indirect contempt for failing to pay the Wells Fargo debt per the terms of the dissolution decree, and we remand to the trial court to order Jennifer to pay $4,340.86 to Steven because of Jennifer's failure to pay the Wells Fargo debt so she may purge herself of the contempt; (2) we reverse the trial court's conclusion that Steven's credit score was not damaged by Jennifer's failure to pay the Wells Fargo debt and we remand to the trial court to enter an order awarding Steven $9,720.00 for the damages related to his truck loan arising from his damaged credit score; (3) we affirm the trial court's finding that Steven is in indirect contempt for failing to pay his share of the children's school expenses and uninsured medical expenses; (4) we reverse the trial court's finding that Steven was in indirect contempt for failing to make contributions to any of the children's extracurricular activities; and (5) we affirm the trial court's

decision regarding attorney's fees. Consequently, we affirm in part, reverse in part, and remand this matter to the trial court for a more precise order.

## Facts and Procedural History

[3] Steven and Jennifer's dissolution decree was entered on July 2, 2014. In pertinent part, Article II, Section 2.1 of the decree awarded the marital residence to Jennifer and provided that

> she shall assume and pay all obligations, debts, liability and encumbrances thereon, including the furnace loan with Wells Fargo on a Home Projects Visa with last four digits of account being 7015. Said Home Projects Visa shall be closed and if she is in possession of actual "cards" associated with said account, the cards shall be destroyed by [her] and she shall text a picture of the cut-up cards to [Steven]. *[Jennifer] warrants that all payments will be made on time, or [Steven] may pursue [Jennifer] for any credit reporting or scoring damages.*

Appellant's App. Vol. II, pp. 45-46 (emphasis added).

[4] As for child support, Article IV of the decree provided, in pertinent part, that "Each party shall pay one-half of the children's school expenses up to $500 total per party per year." *Id.* at 54. The decree further provided that "The parties will pay for all the extracurricular activities that the parent enrolls the children in, *absent an agreement in writing*. If the parties agree on the activity, each party shall pay 50% of the extracurricular expense." *Id.* (emphasis added).

[5] And as for health care expenses, the decree provided, in pertinent part, that "Beginning with 2015, [t]he parties agree to follow the 6% rule, with [Jennifer]

paying the first $982.80 in uninsured medical expenses, and thereafter, the parties splitting medical expenses with [Jennifer] paying 63% and [Steven] paying 37%." *Id.* at 55. In 2016, the parties entered into a mediated agreement whereby Jennifer would pay the first $1,092.00 in uninsured medical expenses, and the parties would divide subsequent uninsured medical expenses with Jennifer paying 67% and Steven paying 33%. *Id.* at 173.

[6] Article V, Section 5.1 of the decree provides:

> Each of the parties agrees that in undertaking to pay certain obligations contained herein, that said party shall fully defend and *hold the other party harmless* for principal, interest, court costs and reasonable attorney's fees, together with any judgment rendered against the innocent party by virtue of the party obligated to pay, failing to fulfill that obligation and an action being brought against the innocent party.

*Id.* at 55 (emphasis added).

[7] Jennifer stopped making payments on the Wells Fargo debt in 2017 and told Steven that she planned to file a bankruptcy petition. Her Chapter 13 bankruptcy petition, which was filed on February 16, 2018, listed the amount of the Wells Fargo debt as $4,220.00.[1] Ex. Vol. II, p. 247 (Ex. 14).

---

[1] The Trustee objected to the amount of the Wells Fargo debt and the matter was resolved, showing the claim allowed as an unsecured claim in the amount of $4,340.86. *See* Ex. Vol. III, p. 107 (Ex. 14). The bankruptcy court entered an order resolving the amount of the Wells Fargo debt claim as $4,340.86 unsecured. *Id.*

[8] Beginning in August 2022, the parties filed several verified petitions for rule to show cause. And Steven also filed a petition to modify child support. After they were ordered to mediation, the parties reached a partial mediation agreement on August 14, 2023. And on November 10, 2023, the parties filed an agreement of issues to be determined at a hearing to be held on November 16, 2023. Generally speaking, the parties agreed to litigate the petitions for rule to show cause and sanctions for violations of discovery requests.

[9] At the hearing, Jennifer testified that through the second quarter of 2023, Steven's share of unpaid uninsured medical expenses for the children was $2,672.01. Tr. Vol. II, p. 55. She further testified that through 2023, Steven's unpaid share of the children's extracurricular activities was $1,493.84. *Id.* She also testified that his unpaid share of the children's school supplies for 2023 totaled $73.84, *id.* at 46, although her petition asked for $75.00. Appellant's App. Vol. II, p. 88.

[10] Steven's petition for rule to show cause alleged that since Jennifer filed for Chapter 13 bankruptcy relief, "Wells Fargo and other creditors have been pursuing [him] for payment of said loan." *Id.* at 61. He alleged that his "credit has been damaged, and he has been unable to secure lending for purchasing a home, etc." *Id.*

[11] Steven provided uncontroverted testimony that he had to secure a subprime loan for the purchase of a new truck because of the damage to his credit score. Steven asked for $9,720.00 in damages. Steven testified that his truck payments

were $610.00 per month until he rebuilt his credit. His truck payments then decreased to $340.00 per month for a difference of $270.00 per month. He made payments at the $610.00 rate for three years. His damages request was based on $270.00 for thirty-six months, or $9,720.00. *Id.* at 93-94. And he produced copies of screenshots of his FICO credit score reports for the pertinent time period, 2017.

[12] After the November 16 hearing, the trial court issued its order. The trial court noted that the child support issue was resolved during mediation and ordered Jennifer to pay $60.00 per week in child support to Steven. The arrearage amount was established as $2,520.00 in favor of Steven.

[13] Steven did not contest the amount of the uninsured medical expenses. The trial court found him in indirect contempt of its prior order for his failure to pay his share. The court determined that Steven owed Jennifer $1,700.00 for his share of the children's extracurricular activities. *Id.* at 39. The court then found Steven owed Jennifer, "the sum of $4,241.00 for his share of uninsured medical expenses, extracurricular activities and school expenses." *Id.* at 41.

[14] The court found Jennifer in contempt for failing to pay the Wells Fargo debt required by the court's order, but did not provide a means for her to cure the contempt. Referring only to the housing loan, the trial court found "[t]here is insufficient evidence to show a direct correlation between [Jennifer's] actions and [Steven's] credit score[,]" citing the lack of "independent evidence of collection letters or the loan." *Id.* at 39. The court made no reference to the

uncontroverted testimony about the impact of Steven's damaged credit score on his truck loan. And the court did not award attorney's fees to either party because they did not present their claims with clean hands.

[15] Steven filed a motion to correct error in which he challenged the trial court's findings and conclusions regarding both the home loan and the truck loan. Steven also asked for a credit of $977.00 for the payment he had made into the court's payment system against his unpaid share of expenses. The court partially granted relief, awarding Steven's request for the $977.00 credit but denying all other relief.

## Discussion and Decision

[16] Steven appeals from the court's order finding Jennifer in contempt for failing to pay the Wells Fargo debt assigned to her in the dissolution decree order. He does not challenge the finding of contempt; instead, he challenges the trial court's failure to impose a sanction for the contempt. We have also reviewed the court's order as it pertains to Steven's contempt and discuss it as well.[2]

---

[2] The dissent maintains that neither party challenged Steven's contempt finding nor did they challenge the damages he was ordered to pay. However, the trial court's order says:

> 20. The Court agrees that the amounts owed by [Steven] in this Order *should be offset* against any remaining arrearage owed by [Jennifer] as well as the previously ordered attorney fees owed by [Jennifer]. Within 30 days, counsel shall submit a joint notice calculating this offset and indicating whether either party owes any additional amount."

Appellant's App. Vol. II, p. 41 (emphasis added). Thus, the majority was compelled to look at the amount Steven owed to Jennifer to accomplish the offset contemplated by the trial court. It is in that review that the majority discovered the language of the order, including language seemingly calling for double payment for the alleged extracurricular activities arrearages, which was incorrect as a matter of

[17] "It is soundly within the discretion of the trial court to determine whether a party is in contempt, and we review the judgment under an abuse of discretion standard." *Steele-Giri v. Steele*, 51 N.E.3d 119, 124 (Ind. 2016) (quoting *Witt v. Jay Petroleum, Inc.*, 964 N.E.2d 198, 202 (Ind. 2012) (citation omitted)). "We will reverse a trial court's finding of contempt only if there is no evidence or inference therefrom to support the finding." *Id.* "The trial court has the inherent power to 'maintain [] its dignity, secur[e] obedience to its process and rules, rebuk[e] interference with the conduct of business, and punish[] unseemly behavior.'" *Id.*

## Jennifer's Indirect Contempt

[18] There is ample evidence in the record to support the trial court's order finding Jennifer in contempt of its dissolution order. Despite the court's order assigning payment of the Wells Fargo debt to her and requiring her to make all payments on time, Jennifer stopped making payments, told Steven she was doing so, and attempted to discharge the debt in her Chapter 13 bankruptcy proceeding.

[19] However, under 11 U.S.C.A. section 523(a)(15), a discharge under section 1328(b) "does not discharge an individual debtor from any debt . . . to a spouse,

---

law. *See id.* at 40(¶13; extracurricular activities arrearage amount)-41(¶16; lump sum including extracurricular arrearage). In addition to the double payment, the findings were not supported by the evidence and, thus, the conclusions were erroneous as a matter of law. As in cases where a party fails to file an appellate brief, and our standard of review is relaxed, we continue to have the "obligation to correctly apply the law to the facts in the record in order to determine whether reversal is required." *WindGate Properties, LLC v. Sanders*, 93 N.E.3d 809, 813 (Ind. Ct. App. 2018).

former spouse, or child of the debtor and not of the kind described in paragraph (5) [for domestic support obligation] that is incurred by the debtor in the course of a divorce or separation or in connection with a separation agreement, divorce decree or other order of a court of record, or a determination made in accordance with State or territorial law by a governmental unit[.]" Federal Rule of Bankruptcy Procedure 7001 provides a list of the types of proceedings which require an adversary proceeding. Among those is "(f) a proceeding to determine whether a debt is dischargeable[.]" FRBP 7001(f) (2024).

[20] In her bankruptcy petition, Jennifer listed the debt to Wells Fargo, but did not list Steven as a co-debtor. Instead, she indicated that she was the sole debtor ("Debtor 1 only") and did so under penalty for perjury. Appellant's App. Vol. II, pp. 12 (Debtor 1 signature under penalty for perjury); 30 (Wells Fargo Debt). She then amended her information on May 25, 2018 to include Steven as a co-debtor regarding the Wells Fargo debt. For notice purposes, however, she provided her parents' address, indicating her parents' address was Steven's address, although he had never resided there. *Id.* at 45 (form); Tr. Vol. 2, p. 57 (testimony).

[21] Steven did not receive actual notice of the April 5, 2018 section 341 creditors' meeting or any of the deadlines for objecting in Jennifer's bankruptcy proceedings, but he was in attendance and participated to some extent.[3] We do

---

[3] Jennifer testified that Steven questioned her at the creditors' meeting. Tr. Vol. II, p. 56.

not have the transcript from that proceeding in the record before us and, therefore, do not know what transpired. But Steven informed Jennifer and her lawyer that he did not receive notice of the bankruptcy proceedings.

[22] On June 18, 2018, Jennifer filed an "Amended Certificate of Service: Notice to Added Creditors," naming Steven and listing his correct address. Appellant's App. Vol. III, pp. 46-48. The document indicated that Steven was being provided at that time with notice of the 341 meeting (which had already taken place) and the amended bankruptcy plan dated May 25, 2018. *Id.* at 47.[4]

[23] During the rule to show cause hearing in the dissolution proceedings, Steven presented testimony from Jerry Smith, a CPA and an attorney whose primary experience and depth of knowledge was in bankruptcy proceedings. Smith testified that by the time Steven received actual written notice of the section 341 creditors' meeting, it was too late for Steven to file an adversarial proceeding to prosecute the hold harmless provision of the dissolution decree, challenging the dischargeability of the debt. Based on Smith's review of the chronological case summary from the bankruptcy proceedings, Steven's deadline would have been April 27, 2018.

[24] In this case, Article II, Section 2.1 of the dissolution decree provided that Steven could pursue Jennifer for any of his credit report scoring or damages related to her obligation to pay the Wells Fargo debt. Appellant's App. Vol. II,

---

[4] Those attachments are not in the record before us.

pp. 45-46. And Article V, Section 5.1 contains the parties' hold harmless provisions for the assumed debts. "A provision in a divorce decree to hold harmless or indemnify a spouse for joint obligations incurred during a marriage creates a 'new' debt, running solely between the former spouses." *In re Jaeger-Jacobs*, 490 B.R. 352, 356 (Bankr. E.D. Wisc. 2013). "While the 'new' debt is 'incurred' through the divorce decree; the parties' personal liability with respect to their joint third party remains unless discharged." *Id.*

[25] Put differently,

> the exception to discharge for "hold harmless" agreements may not provide protection from creditors for the non-debtor spouse. The debts owed to the joint creditors are discharged as to the debtor only. The obligation that is not dischargeable in these situations is a debtor's responsibility to hold his non-debtor, ex-spouse harmless. The non-debtor ex-spouse may look to the debtor for reimbursement pursuant to any nondischargeable "hold harmless" obligations, but the non-debtor ex-spouse is not immune from pursuit by the primary joint creditors.

*In re Clark*, 207 B.R. 651, 657 (Bankr. E.D. Mo. 1997). Because Steven was not provided with the opportunity to object to Jennifer's discharge of the debt,

> [Wells Fargo] would not be on notice of [Steven] the co-debtor, and therefore would treat the co-debtor as if there was no stay in place in—I believe, in most cases. They would not have any reason to believe that the stay applies to [Steven] the co-debtor, and so they would continue to pursue the co-debtor.
>
> . . . .

But pretty much [523] Subsection 15 would take something like this and make it nondischargeable. So what the effect of that is, is if Mrs. Norris successfully completed her bankruptcy, which she did, Wells Fargo would've discharged the debt as to her and wiped it off her credit report and not pursued her anymore. However, they would never take that debt off of a co-debtor, whether they were protected during the bankruptcy or not, with the co-debtor stay unless that debt is paid off by someone, the co-debtor is still liable as far as Wells Fargo is concerned, and they're going to continue to pursue Mr. Norris until they're paid in full or he files for bankruptcy.

. . . .

[A]s to Ms. Norris, they discharged her debt. I'm sure they've written it off and showed her credit report as zero balance, and made note that was discharged in bankruptcy, or maybe not. And then that will fall off her credit report at the statutory deadline for that, which I'm going to say it's Chapter 13 is—let's see. Chapter Seven is [ten years]. Chapter 13 is seven years. So, it's probably getting pretty close to being off of there.

Tr. Vol. II, pp. 21-22, 24 (Smith's testimony).

[26] Steven provided uncontroverted testimony that the impact of long-term history of non-payment on a credit score "would be devastating to his credit." *Id.* at 27. Smith testified as follows concerning credit report scores.

If you're up above 720 or so, you're in the top 25 percent of people and those are considered really good credit scores. And you can get loans with, you know, really good interest rates, especially, 700 plus as you get up around 720, there's really not much better interest rates you can get. Once you drop below 680 in your credit score, you stop getting normal ones and you start

paying, you know, significantly higher interest rates. Sometimes you have to go with some sub—I don't know what you call them, subpar lenders, but they'll charge you points and fees or more fees on loans. . . And if you get [too] far below 680 or really, once you start getting down under 660, there's just nobody who's going to finance you anything reasonable for a house. . . . And car loans are going to be a 20, you know, 20 plus percent. And that's really difficult to recover from.

*Id.* at 33.

[27] Steven testified that his credit score was affected by Jennifer's non-payment of the Wells Fargo debt. The second page of Steven's Exhibit 3 was a notice of non-payment of the Wells Fargo debt directed to him. Ex. Vol. II, p. 179. The first page of Exhibit 3 illustrates the impact of the non-payments on Steven's FICO score, which was 719 in May and was 642 by October of 2017. *Id.* at 178. Uncontroverted evidence showed that Jennifer stopped making payments on the Wells Fargo debt in 2017. Steven's Exhibit 4 shows that in the six months prior, his credit score remained above 700. *Id.* at 181.

[28] He also testified that he purchased a truck during the time his credit score was affected by the non-payment of the debt. His initial payments were $610.00 per month because he had to use a subprime lender for the loan. Tr. Vol. II, p. 93. He continued making truck payments in that amount for the next three years until his credit score improved and he was able to secure better financing. His payments were then reduced to $340.00 per month. Steven sought $9,720.00 (or $610.00- $340.00= $270.00 x 36 months) for the damage to his credit score.

[29]    We conclude that the trial court's finding of insufficient evidence in the record to support Steven's claim is erroneous in that it lacks support in the record. Put differently, Steven's uncontroverted testimony and exhibits establish that his credit score was damaged by Jennifer's failure to pay the Wells Fargo debt as assigned in the decree. Therefore, we remand this matter to the trial court to issue a new order showing that Steven has established damage to his credit score in the amount of $9,720.00.[5]

[30]    Additionally, though the court found Jennifer in contempt, it provided her with no means to purge herself of the contempt. And at the same time, offered no remedy to Steven for her failure to hold him harmless as to the debt. The

---

[5] The trial court's order on Jennifer's indirect contempt stated: "There is insufficient evidence to show a direct correlation between [Jennifer's] actions and [Steven's] credit score. There was no independent evidence of collection letters or the loan. All of [Steven's] professed damages were based upon speculation. Further [Steven] testified that he sold the land for legal expenses unrelated to the bankruptcy or the instant proceeding. [Steven's] request for damages is unpersuasive and Court denies same." Appellant's App. Vol. II, p. 39.

The dissent maintains that the majority decided issues sua sponte and reweighed evidence. The majority does neither. While the briefs are not a model of clarity, all issues discussed and decided by the majority are, in fact, raised by Steven. Steven initially raised a substantial loss, in general, but the detail in his opening brief focusses on his truck loan. It is for that reason we agreed with the trial court that general losses were not substantiated. However, the truck loan is traced very specifically to the loss in his credit due to Jennifer's bankruptcy. The trial court *did not* find Steven's testimony lacked credibility. If the Court decided the matter on a credibility issue, then that would be reweighing the evidence. And to hold as the dissent would, that the exhibits and the testimony of a sole witness are not "definitive evidence" is essentially reweighing the evidence.

Instead, the trial court found no connection between the truck loan increased costs and Jennifer's bankruptcy, which suggests the record is silent. To the contrary, the record has a plethora of detail in support of Steven's argument. And that detail was *uncontroverted*. Our review does not involve a reweighing of that evidence, but adheres to the legal notion that reversal is required where the court's conclusion is contrary to law. The court's finding considered only the speculative general losses, which it correctly decided, but completely disregarded the uncontroverted, detailed testimony Steven presented about the loss associated with the truck loan caused by Jennifer's bankruptcy. It is in that manner that it erred as a matter of law and it is our duty to correct it.

evidence in the record before us shows that Jennifer's Chapter 13 Plan was approved by the bankruptcy court and that the court accepted the trustee's valuation of the Wells Fargo debt as $4,340.86. Therefore, we remand this matter to the trial court to issue an order for Jennifer to pay Steven $4,340.86 to pay off the Wells Fargo debt because of Jennifer's failure to pay it.[6]

[31] Whether Wells Fargo has continued to pursue Steven for satisfaction of the debt is irrelevant because he remains a co-debtor. Jennifer must honor the hold harmless provision of the decree and pay Steven $4,340.86 and because of her failure to pay the Wells Fargo debt. In his way, Jennifer may purge herself of her indirect contempt.

[32] Additionally, Steven's claim that he should be awarded damages associated with the loss of an SBA loan and a housing loan does not fare as well as his

---

[6] The dissent disputes whether the trial court can order Jennifer to pay the Wells Fargo debt amount to Steven, because it is a complex issue. The majority is not creating law. Hornbook dissolution law tells us that "The court shall divide the property in a just and reasonable manner by setting the property or parts of the property over to one (1) of the spouses and requiring either spouse to pay an amount, either in gross or in installments, that is just and proper[.]." Ind. Code § 31-15-74(b)(2)(1997). The trial court assigned the Wells Fargo debt to Jennifer. She did not pay it and discharged the debt solely as to her in bankruptcy proceedings without listing Steven as a co-debtor until it was too late in the bankruptcy proceedings for him to object and/or protect himself from being subjected to pursuit by creditors for a debt assigned to her. Jennifer's actions also constituted an indirect contempt of the trial court's order, which the court found. However, the court erred by failing to provide a remedy by which Jennifer could purge herself of contempt. Put simply, the court failed to designate what Jennifer had to do to bring the division of assets debt back into balance per the terms of the dissolution decree and remove Steven's liability for the Wells Fargo debt. She promised to hold Steven harmless through the terms of the dissolution decree and the decree allowed him to pursue her for any damages to his credit score which could arise out of her failure to uphold her responsibilities under the decree. Because of Jennifer's actions, Steven had no remedy in bankruptcy court. He sought relief in the trial court which was only partially granted (the indirect contempt finding). What was lacking was the remedy for the damages to Steven for her contempt and a way in which Jennifer could purge herself of the contempt. The trial court certainly has the power to order Jennifer to pay what she was ordered to pay in the first place but did not. Jennifer still has an obligation to pay Steven the remaining debt amount which the record clearly shows is $4,340.86, which the majority found.

claim associated with his truck loan. The testimony and the evidence regarding the impact of Jennifer's contempt on those debts was generalized and, in one instance, essentially refuted on cross-examination; whereas, the testimony and exhibits establishing the correlation between Jennifer's contempt and his truck loan was specific. Consequently, we affirm the trial court's rejection of a correlation between Jennifer's indirect contempt as to the SBA loan and housing loan.

## Steven's Indirect Contempt

[33] Likewise, there is ample evidence in the record to support the trial court's order finding Steven in contempt of its dissolution order. However, its order lacks precision in explaining the financial consequences to Steven to allow him to purge himself of the indirect contempt.[7]

---

[7] The trial court's order lacked mathematical precision. As explained above, the trial court intended to offset the amounts owed by each party. The majority determined that because of the evidence of the direct link between Jennifer's bankruptcy and Steven's damaged credit score as it related to his truck loan, she owed him the amount of his uncontroverted damages, $9,720.00. And in looking at Jennifer's indirect contempt, the majority determined that she owed Steven the amount of the Wells Fargo debt discharged in bankruptcy, or $4,340.86, to provide her with a means by which to purge herself of contempt and to accomplish the original division of property. When we looked at the trial court's order, the majority could not reconcile the amounts owed as listed, and the errors of law were presented (twice ordering the payment of alleged extracurricular arrearages; incomplete itemization of arrearages; incorrect finding of indirect contempt regarding extracurricular activities arrearages). The dissent would affirm the trial court in total which also suggests the dissent would affirm the trial court's finding that the husband still owes for extracurricular activities (which the majority points out even has a mathematical error in it) but makes no argument as to why the majority is incorrect. Accordingly, the majority maintains a reversal of the husband's obligation on the extracurricular expenses.

[34] First, the court determined that the decree should be read to require the parents to equally share the children's school supply expenses. However, the court did not specify the amount Steven was required to pay. *See* Appellant's App. Vol. II, p. 40 (¶12). Jennifer's petition asked for Steven to reimburse her for $75, which she represented was his share. She testified, however, that Steven's share was $74.79. Tr. Vol. II, p. 45; Ex. Vol. II, p. 38. (Ex. U). And she also testified that his share for 2023 was $73.84. Tr. Vol. II, p. 46. The trial court should include in its revised order that Steven owes Jennifer $75.00 for that arrearage.

[35] Next, the court explicitly determined that Steven was required to pay $1,700.00 for his share of the children's extracurricular activities. *See* Appellant's App. Vol. II, p. 40 (¶13). This amount appears to come from Jennifer's Exhibit R, which purported to show the "split cost per decree: $1700/each[]" for the children's baseball and basketball registrations and fees from 2016 through part of 2024. Ex. Vol. II, p. 8 (Sports Registrations and Sports Fees). Looking at Exhibit R, Jennifer's spreadsheet showed that Steven had contributed $206.66, but those contributions were not credited against what she claimed was Steven's half of the expenses. Ex. Vol. II, p. 8 ($1700.00 -$206.66= $1493.34). Nonetheless, Jennifer testified that she sought $1,493.84. Tr. Vol. II, p. 55. Therefore, the trial court's order finding Steven was $1,700.00 in arrears on the extracurricular activity expenses is erroneous because it is not supported by the evidence. The error is compounded because the "$1,700.00" from Paragraph 13 appears to be included in the lump sum calculated by the court in Paragraph 16 of its order, stating that Steven owes Jennifer $4,241.00 for "his share of

uninsured medical expenses, *extracurricular activities* and school expenses." Appellant's App. Vol. II, p. 41 (emphasis added).

[36] The trial court's order is erroneous for an additional reason. We note that the parties' decree stated that "The parties will pay for all the extracurricular activities that the parent enrolls the children in, *absent an agreement in writing*. If the parties agree on the activity, each party shall pay 50% of the extracurricular expense." *Id.* at 54 (emphasis added). The language of the decree makes clear that if one of the parents enrolls the children in an extracurricular activity, the enrolling parent bears the financial burden of the expense unless the parents agree in writing to split the cost of the extracurricular activity. In that event, the parties will each pay half.

[37] Jennifer responded "Correct." to her attorney's question that "the parties were to equally divide extracurricular expenses for the children. Correct?" Tr. Vol. II, p. 36. However, the question and answer did not contemplate or include the important requirement of a written agreement. Steven testified at the hearing that

> the understanding for the extracurricular activities, from our standpoint—and I say our, because it was never even mentioned—it's never even been mentioned—wanting half unless we both agree, prior to. That has always been the place. [Jennifer] has never once, until you became her attorney, mentioned that I should owe half of extracurricular activities. I've never once been requested it from her that I owe all this previous amount—nothing.

…..

> In fact, one of the emails even says, If you want to contribute, here would be your half.

Tr. Vol. II, p. 130; Ex. Vol. II, p. 45 (Ex. E; "The amount paid [for fall ball/rec league] is $142, your portion if you choose to pay is $71."); Ex. Vol. II, p. 27 (Ex. T: "I'm sure you already knew I was signing the boys up for baseball since we have been playing for over 4 years now and they have brought up playing on multiple occasions including [one of the children] asking about it last week. If you plan on contributing your portion this year is $123.50."); *id.* at 29 (From Jennifer: "The boys did get signed up for basketball. They really liked the evaluation night and still wanted to play. If you decide to pay for any of it, your portion is $86.50."); *id.* (From Steven: "For you to just sign them up without any sorts of discussion between us is very disrespectful."); *id.* at 28 (From Jennifer: "I apologize. My mistake is probably that I assumed because I had said in my email that if they liked it I would sign them up after the evals. I never heard anything back from you after that."); *id.* at 30 (From Jennifer: "Both boys have continued to ask to play fall ball since baseball ended this spring. I plan on signing them up for the season plus it will help prepare them for next year sense [sic] they will move up to Rookies. If you plan on contributing your portion would be $100.")

[38] One of the email exchanges included in the record reflects the parties' understanding of the decree and practice in this regard.

Jennifer:  Both boys want to do fall [base]ball.  I have been asking [one of the boys] if he is sure he wants to try it out again and he has been consistent.  So I would like to sign them both up before [registration] closes.  The cost will be $300 total.  $150 each.

Steven:  I'm glad to hear that [one of the boys] wants to play baseball again.  I hope he enjoys it.

Unfortunately, with just undergoing surgery and multiple delays implementing significant change, financially I'm unable to accommodate this expense.

After briefly reviewing a portion of your recent finances though, I'm encouraged that you will be able to make room in your budget for the costs of their participation this upcoming fall season.  Rest assured that I will continue to support the boy[s'] activities logistically and encouragingly on the same level as I always have."

Exhibit Vol. II, p. 21 (Exhibit T) (formatting modified).  And Jennifer's Exhibit R showed instances where Steven "refused," which could mean many things, including that he did not agree to share in the expense, especially in the absence of a written agreement or evidence of a verbal agreement that he would pay half.  *Id.* at 8 (Exhibit R).

[39]   Steven may have chosen to voluntarily contribute to the extracurricular activities without giving his written or verbal consent to pay half.  However, his failure to voluntarily contribute to any of the children's extracurricular activities absent a written agreement is an invalid basis for indirect contempt.  To be sure,

the court should encourage Steven to contribute toward those expenses as he can. Nevertheless, the trial court's conclusion that Steven's failure to pay half of the expense of any of the children's extracurricular activities constituted an indirect contempt, it was in error.

[40] Jennifer's testimony established that she sought $2,672.01 in uninsured medical expenses from Steven. Tr. Vol. II, p. 55. And Steven did not dispute Jennifer's request. Additionally, the evidence established $75.00 as the arrearage amount for Steven's share of school supplies. However, the evidence shows that Steven was entitled to a credit of $977.00, which was allowed after his motion to correct error was granted. Consequently, the evidence establishes Steven's arrearage to be $1,770.01 ($2,672.01 +75.00=$2,747.01-$977.00=$1,770.01).

[41] It appears that Jennifer owes Steven $2,520.00 in child support arrearage. And she owes Steven $9,720.00 for the damage to his credit score resulting in higher truck loan payments from a subprime lender, and at least $4,340.86 for her failure to pay off the Wells Fargo debt. Offsetting the amounts owed to each party, Jennifer owes Steven $14,810.85 ($2,520.00 +$9,720.00 + $4,340.86=$16,580.86-$1,770.01=$14,810.85). The trial court has already entered its order establishing a schedule for Jennifer's payment of the $2,520.00 child support arrearage. We remand this matter to the trial court to include in its order how Jennifer is to pay the remainder, or $12,290.85. Each party is responsible for their own attorney's fees in this matter.

## Conclusion

[42] We remand this matter to the trial court for a revised order establishing: (1) that Jennifer owes Steven $9,720.00 regarding his truck loan only for the damage to his credit score from her non-payment of the Wells Fargo debt; (2) that Jennifer must pay $4,340.86 to Steven because of her failure to pay the Wells Fargo debt to cure her indirect contempt and honor the hold harmless clause of the decree; (3) Steven's arrearage for school supplies and uninsured medical expenses less the $977.00 credit as $1,770.01; (4) Steven is not in indirect contempt for failing to pay for any of the extracurricular activities to which he did not agree either verbally or in writing; and (5) each party is responsible for payment of their own attorney's fees.

[43] Affirmed in part, reversed in part and remanded.

Altice, C.J., concurs.
Tavitas, J., dissents with opinion.

ATTORNEY FOR APPELLANT

Denise F. Hayden
Lacy Law Office, LLC
Indianapolis, Indiana

ATTORNEY FOR APPELLEE

Nicole A. Zelin
Pritzke & Davis, LLP
Greenfield, Indiana

**Tavitas, Judge, dissenting.**

[44] I respectfully dissent from the majority's reversal of the trial court's judgment here. I would affirm the trial court's judgment.

[45] First, I note that neither Steven nor Jennifer have appealed the trial court's finding that Steven was in contempt or the damages that Steven was ordered to pay as a result of the contempt. Thus, the majority has addressed the issue sua sponte, which I conclude is inappropriate. *See, e.g.*, *Mayberry v. Am. Acceptance Co., LLC*, 242 N.E.3d 1053, 1057 (Ind. 2024) (holding that the Court of Appeals abused its discretion by sua sponte dismissing an appeal).

[46] Second, the trial court found "insufficient evidence to show a direct correlation between [Jennifer's] actions and [Steven's] credit score. . . . All of [Steven's] professed damages were based upon speculation." Appellant's App. Vol. II p. 39. The majority reverses the trial court's finding regarding Steven's truck loan and orders Jennifer to pay $9,720.00 for damages related to his truck loan due to his damaged credit score. The evidence presented by Steven, however, does not definitively establish that his credit score was damaged by Jennifer's actions. Because the trial court denied Steven's petition for damages, Steven appeals from a negative judgment. "In such circumstances, we will reverse the judgment only if it is contrary to law—where the evidence leads to but one conclusion and the trial court reached the opposite conclusion." *G.G.B.W. v. S.W.*, 80 N.E.3d 264, 269 (Ind. Ct. App. 2017), *trans. denied*. Moreover, in conducting our review, we consider the evidence in the light most favorable to

the appellee. *Id.* I conclude that the majority is reweighing the evidence on appeal, which we cannot do. *See Akiwumi v. Akiwumi*, 23 N.E.3d 734, 741 (Ind. Ct. App. 2014) ("When we review a contempt order, we neither reweigh the evidence nor judge the credibility of the witnesses.").

[47]  Finally, the majority orders Jennifer to pay $4,340.86 to Steven because of her failure to pay the Wells Fargo debt. Whether the trial court could order Jennifer to pay the Wells Fargo debt to Steven after it was discharged in bankruptcy is a complex issue not adequately addressed by the parties' briefs. Steven cites no relevant authority on the issue.[8] We will not invent arguments on the challenging party's behalf. *Correct Roofing, Inc. v. Vasquez*, 246 N.E.3d 328, 336 (Ind. Ct. App. 2024); *see also Miller v. Patel*, 212 N.E.3d 639, 657 (Ind. 2023) ("[W]e resolve concrete issues properly tested through the adversarial process: adequate and cogent briefing is required for that process to live up to its potential."). Indiana Appellate Rule 46(A)(8)(a) provides that the argument section of an appellant's brief "must contain the contentions of the appellant on the issues presented, supported by cogent reasoning." The appellant must support its contentions by citation to relevant authorities, statutes, and appendices. *Correct Roofing*, 246 N.E.3d at 336.

---

[8] The majority misinterprets this contention. *See* supra p. 15 n.6. I do not dispute whether the trial court could order Jennifer to pay the Wells Fargo debt because it is a "complex issue." I dispute whether we should address the issue on appeal because Steven has failed to adequately brief this complex issue. Again, we should affirm the trial court's decision due to Steven's failure to make a cogent argument.

[48]  I would find Steven's argument waived for failure to present relevant authority and a cogent argument. Further, the majority partially bases its decision upon the hold harmless provision of the parties' Settlement Agreement. The parties, however, never mention this provision in their briefing. Again, the majority sua sponte raises the issue, which I conclude is inappropriate here.

[49]  For these reasons, I respectfully dissent.